## Klinger Estate

*William F. Martson* and *Warren G. Morgan,* for petitioner.

*Bruce Cooper* and *William E. Woodside,* for respondent.

SWOPE, P. J., April 1, 1963.—Clarence R. Klinger, a resident of Dauphin County, died on December 3, 1960, leaving a will dated May 28, 1953. Letters of administration c.t.a. were granted on said estate to George Reinoehl on December 16, 1960. The will provided, inter alia:

"2. I give, devise and bequeath unto William Yocum, of Buffalo, New York, if he survives me, my business known as K.U.K. Auto Transit, and all the land, buildings and premises of said business, except any real estate which I may own at the time of my decease in Bedford County, Pennsylvania, which I hereby direct to be sold by my Executrices, who shall give unto William Yocum the first chance to purchase the same at the then market value. I declare that this gift shall include all utility rights, privileges and certificates now held by K.U.K. Auto Transit, all equip-

ment, machinery, vehicles and benefit of all contracts subsisting in relation thereto at my death, and all book debts which shall then be owing to me in relation to said business, and all securities, money, cash or money at the bank to the credit of the said business account; and the said William Yocum shall take over and discharge all liability in connection with this my said business existing at the time of my decease, and he, the said William Yocum, shall indemnify my estate against the same."

The residue of the estate was bequeathed to other named persons.

On January 18, 1962, William Yocum petitioned this court for a declaratory judgment concerning the rights in three shares of P & M Auto Transport of Illinois, Inc., and the balance due on a bailment lease between that corporation and decedent covering tractors and trailers formerly owned by K. U. K. Auto Transit. Petitioner has averred that although said stock certificates bear a corporate name other than K. U. K. Auto Transit, the certificates are in fact representative of the business referred to by decedent in his will, and therefore were devised to him. In its answer, the estate claims that K. U. K. Auto Transit was liquidated prior to decedent's death, denies that the certificates are representative of the business referred to by decedent in his will and contends that P & M Auto Transport is a separate corporate entity bearing no relationship to the dissolved sole proprietorship. Whereas petitioner claims that the balance due from P & M on the sale of equipment is owed to K. U. K., the estate contends that this sum of money was due to Clarence R. Klinger, individually.

After reviewing the evidence adduced at two hearings, the court makes the following findings of fact:

1. Clarence R. Klinger, decedent, conducted a business in the form of a sole proprietorship, under the

name of K. U. K. Auto Transit, hereinafter referred to as K. U. K., at the time he executed his will on May 28, 1953. The nature of this business was a common carrier of automobiles for Chrysler Corporation.

2. Mr. Reinoehl, the administrator of the estate, was given the power to write checks on the K. U. K. account by decedent in 1959, and was appointed Mr. Klinger's guardian in 1959, after decedent suffered a severe stroke.

3. William Yocum came to K. U. K. as a driver in 1940. In 1954, he was made a director of the Bedford, Pennsylvania, operations of K. U. K., and in 1957 was placed in charge of operations for the entire company.

4. Sometime prior to May, 1957, in order to obtain operating authority from Chrysler for the northeast seaboard, and for no other reason, decedent and six other Chrysler carriers, some of which were corporations, formed Associated Eastern Convoys, Inc., a Delaware corporation. This corporation obtained no rights and made no attempt to buy any other carrier. It was liquidated as it was unable to serve its purposes.

5. In May, 1957, Chrysler summoned all carriers to a meeting in which William Yocum represented K. U. K. At this time, Chrysler announced a new policy, requiring larger carriers and reducing the number of shippers with which it would deal. K. U. K. and a number of other companies were not large enough to continue operating a franchise under the new policy. On June 28, 1957, a representative of Chrysler wrote decedent stating that unless K. U. K. combined with other small carriers by July 8, 1957, it would be "phased out" of the carrier operations by August 31, 1957.

6. For the purpose of complying with the demands of Chrysler, the seven carriers forming Associated Eastern Convoys, Inc., plus an additional company, entered into negotiations to establish a suitable carrier

entity. Six of the carriers formed P & M Auto Transport, Inc., a Delaware corporation, on August 8, 1957. Yocum represented decedent at these meetings and was made one of the six directors. The 20,000 shares issued to Mr. Klinger were paid for from Mr. Klinger's personal checking account.

7. In order to enlarge its operating authority as required by Chrysler, the Delaware corporation purchased Auto Forwarding Co., Inc., an Illinois corporation formed in 1932, and changed its name to P & M Auto Transport of Illinois, Inc.

8. The Delaware corporation was dissolved in 1960 by order of the Interstate Commerce Commission, pursuant to that agency's policy of simplifying corporate structure. Decedent's shares were exchanged for three shares in the Illinois corporation, which were issued in the name of the court appointed guardian of Mr. Klinger. Decedent retained the same proportion of ownership in the Illinois corporation that he had in the Delaware corporation. No checks were written on the K. U. K. account to purchase or advance money to Associated Eastern Convoys, P & M of Delaware, or P & M of Illinois.

9. On August 30, 1957, K. U. K. leased 12 trailers and 16 tractors to P & M of Illinois in consideration for 85 percent of the net revenue from the vehicles. K. U. K. gave exclusive possession for any purpose to the corporation, but K. U. K. was responsible for hiring, paying and insuring the drivers and all operating and maintenance costs of the vehicles.

10. On May 27, 1958, P & M of Illinois entered into a bailment lease agreement with Clarence R. Klinger, covering seven tractors and seven trailers, wherein the corporation agreed to lease the equipment with an option to buy each vehicle for one dollar after all payments on that vehicle were made. K. U. K. is not mentioned in the text of the document, but it is designated

as the lessor on the schedule of vehicles subject to the agreement. Title in the vehicles remained in the name of K. U. K. The revenue equipment not sold to P & M of Illinois has been sold to third parties and is not a part of this controversy.

11. After the formation of P & M of Delaware, K. U. K. performed no carrier functions and surrendered its operating rights. The books of K. U. K. were closed in 1958, except for several out-of-state accounts and a bank account. All physical operations of K. U. K. ceased no later than February of 1959.

12. Mr. Klinger did not take an active part in the management of a carrier business from the time of the formation of Delaware P & M until his death. Although he received management fees, he never was a director of either corporation and never visited any of the places of business of the corporations. Mr. Yocum represented decedent on the board of directors of P & M of Illinois and Delaware, but Mr. Klinger was only interested in the important financial developments of the corporations.

13. Prior to becoming incompetent, decedent pledged the bailment lease with the Lykens Valley Bank of Elizabethville as collateral for a personal loan. The estate has repaid the loan and possesses the collateral. More than $18,000 was owed by P & M of Illinois on the bailment lease at decedent's death. Prior to the time Mr. Klinger became sick, the payments on the bailment lease were made by check to the order of decedent personally. After Mr. Reinoehl began to manage decedent's affairs, he had the checks deposited in the K. U. K. checking account so that he would have sufficient funds to pay Mr. Klinger's bills. At the guardian's request, later checks were made payable to K. U. K. instead of to the deceased.

14. William Yocum is presently operations director of P & M of Illinois and has been secretary of the cor-

poration since 1960. He has been a member of the board of directors since 1958.

## Discussion

The estate of Clarence R. Klinger now holds the three shares of P & M of Illinois and a bailment lease, which petitioner claims passed to him under the terms of the will of Clarence R. Klinger, as they are representative of decedent's interest in his sole proprietorship. To this contention, the estate answers that the bequest to petitioner has been adeemed.

The bequest of "my business known as K. U. K. Auto Transit . . ." is a specific bequest and is adeemed if decedent did not own the subject matter of the gift when he died: Gerlach Estate, 364 Pa. 207, 16 A. L. R. 2d 1397. As the Supreme Court said in Hoke v. Herman, 21 Pa. 301 (1853), at page 305:

"We hold therefore that if a thing bequeathed in a will by such a description as to distinguish it from all other things disposed of, so that it does not remain at the death of the testator, or if it be so changed that it cannot be called the same thing, the bequest is gone. . . . This results from an inflexible rule of law applied to the mere fact that the thing bequeathed does not exist, and it is not founded on any presumed intention of the testator."

Mr. Justice Linn, in Horn's Estate, 317 Pa. 49, 52 (1934), applied the following test to ascertain whether or not there had been an ademption:

"The question now is: Does the thing given exist? —are the shares in the third and fourth corporations substantially the same thing as the Fuel Corporation stock, though in different forms and with different names? . . ."

It cannot be disputed that K. U. K. as a sole proprietorship was not in existence at the time of testator's death. Petitioner's contention is that the change was in form only and not a change of substance. Of course,

a change in form does not result in an ademption, but the difficulty is in deciding whether or not there has been a change in form only. For this purpose, there are two significant Pennsylvania cases which must be considered.

Gerlach Estate, supra, held that the mere transformation of a sole proprietorship into a corporation will not result in an ademption. In that case, testator bequeathed "my business known as Allentown Supply Co." Prior to the execution of the will, the business had been a three-man partnership, then a corporation, and then a two-man partnership, with testator owning the vast majority interest at the time of execution. After the will was executed, the partnership was changed into a corporation again with testator receiving 15,000 out of 15,033 shares. However, testator died before the certificates were issued. The Supreme Court held that where testator owned almost all the shares, "my business" had merely changed its form.

In Horn's Estate, supra, testator bequeathed his shares in O corporation by a will written in 1926. Later in that year O corporation and X corporation placed their property in Y corporation with the shareholders in O corporation receiving common and preferred stock in Y corporation in exchange for their shares in O corporation. In 1929, there was a common stock split, and in 1930, there was a common stock dividend on common stock. In 1930, Y corporation spun off Z corporation and the Z stock was placed in a voting trust from which testator received certificates of interest by reason of his ownership of Y stock. The legatee claimed all the common stock, the preferred stock, and the certificates of interest, but the Supreme Court held that he was entitled to none of them, because the O stock had been adeemed. See also Kepple's Estate, 19 Dist. R. 627 (1910), where testator bequeathed stock in X railroad company. Later he sur-

rendered his X stock to Y railroad company in exchange for Y stock; the court held that there was an ademption.

Assuming that P & M of Illinois is a continuation of the carrier business known as K. U. K., the present case appears to be governed by Horn's Estate rather than Gerlach's Estate. Decedent did not merely change a sole proprietorship into a corporation. He rather allowed it to be combined with several other business entities to form a consolidated corporation and that corporation bought the corporation whose shares are now in controversy. Testator bequeathed "my business" to William Yocum. K. U. K. fits the designation of "my business", but P & M of Illinois could hardly be placed within that description. Decedent was only one of six shareholders in the Illinois corporation; he did not take an active part in its management; he never was an officer or director; and he never even visited its place of business. If we can assume that P & M of Illinois was ever considered "my business" by testator, it certainly ceased to be his business when the lease with P & M providing for 85 percent of the net revenue to be paid decedent was replaced with the bailment lease. Testator was a mere investor in P & M of Illinois, only interested in the important financial development of the corporation.

Because of the change in substance of the subject matter of the bequests, there were ademptions in both the Horn and Kepple cases, although a tracing was not difficult. However, in the present case, petitioner has not even been able to trace K. U. K. property into shares of P & M of Illinois. Decedent paid for P & M of Delaware shares out of his personal checking account, not from the K. U. K. account. Mr. Klinger acquired his shares in P & M of Illinois only by reason of his ownership of P & M of Delaware shares. *No checks were written on the K. U. K. account to pur-*

*chase or advance money to either corporation; nor was equipment exchanged for stock in either corporation.*

Petitioner also claims the balance due on the contract with P & M of Illinois concerning the lease and sale of tractors and trailers. Item 2 of the will, in addition to bequeathing the business states:

"I declare that this gift shall include . . . all equipment, machinery, vehicles and benefit of all contracts subsisting in relation thereto at my death, and all book debts which shall then be owing to me in relation to said business. . . ."

As stated in findings of fact nos. 10 and 13, in 1958, P & M of Illinois and Clarence R. Klinger entered into an agreement wherein P & M leased equipment and had an option to purchase for one dollar at the expiration of the lease. K. U. K. was not mentioned in the lease, but it is designated as the lessor on the schedule of vehicles subject to the agreement. Title to the equipment was never transferred from K. U. K. to Clarence R. Klinger and by the terms of the agreement, it did not pass in the bailment lease until all payments were made and the option exercised. Clarence Klinger pledged this agreement with the Lykens Valley Bank of Elizabethville as collateral for a personal loan. At decedent's death, his estate redeemed the pledge by paying the debt.

The tractors and trailers would have been "vehicles" bequeathed by the will had nothing more happened. Without the specific wording of the will, the bailment lease alone would not have adeemed the bequest until the option was actually exercised by P & M (Wellejus' Estate, 59 D. & C. 27 (1947); nor would the pledge have resulted in an ademption (Estate of Jacob Young, 32 Pitts. L. J. 403 (1885)). However, with the specific wording as used in the will, the agreement will not pass to the named legatee unless it is an agreement in "relation to said business."

Although the contract with P & M was entered into incident to winding up the affairs of K. U. K., it was a contract in relation to K. U. K. and passes to Mr. Yocum. P & M originally sent checks payable to Clarence R. Klinger instead of K. U. K., but only because the K. U. K. account was not active, not because it was not a payment connected with an agreement in relation to K. U. K. Furthermore, at Mr. Klinger's death, payments were being made to K. U. K. Mr. Reinoehl was acting for Mr. Klinger. Just as it would have been immaterial to the question of ademption had he done an act to sever the relationship of the property to K. U. K. (Hoke v. Herman, supra), it is immaterial that it was he and not testator who strengthened the relationship between K. U. K. and the bailment lessee.

A further problem has arisen because the estate redeemed the pledge. Ordinarily it is the duty of the executor to perform such an obligation by repaying the debt with funds from the residuary estate: Fiduciaries Act of April 18, 1949, P. L. 512, sec. 751 (a). However, respondents contend that the funds used to repay the Lykens Valley Bank should come from the property pledged, because of the following provision in Item 2.

". . . and the said William Yocum shall take over and discharge all liability in connection with this my said business existing at the time of my decease, and he, the said William Yocum, shall idemnify my estate against the same."

The court cannot agree with the respondents because the above provision refers to "all liability in connection with this my said business." The liability to the bank was the result of a personal loan and was not connected with K. U. K. The pledging of a book debt or contract in relation to a business does not make the underlying liability one in connection with that business.

Accordingly, April 1, 1963, it is our judgment that petitioner, William Yocum, is not entitled under the will of Clarence R. Klinger to claim the three shares of P & M Auto Transport of Illinois, Inc., remaining in the estate of decedent at the time of his death. Further, the gift provided in the will of decedent of his business known as K. U. K. Auto Transit to William Yocum must be taken as adeemed except for the remaining balance due at the date of death on the bailment lease of equipment entered into in 1958 by and between P & M of Illinois and Charles R. Klinger, which agreement passed to William Yocum by the terms of decedent's will, free of any charge for repayment out of his estate of the personal debt of decedent to secure which it may have been pledged. The personal representative of decedent is, therefore, directed to administer the estate and prepare his account and petition for distribution in accordance with the above.